IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No. 3:24-cr-30004-DWD |
| vs. ) | |
| ) | |
| LAMAR R. BENNETT, ) | |
| ) | |
| Defendant. ) | |

### MEMORANDUM & ORDER

Before the Court are Defendant's Motions to Withdraw Guilty Plea and to Dismiss the Indictment. (Docs. 51 & 52). The Government filed Responses in Opposition to each Motion. (Docs. 54 & 55). For the reasons explained below, the Motion to Withdraw Guilty Plea is **DENIED** and the Motion to Dismiss Indictment is **DENIED as moot**.

### I. BACKGROUND

On January 17, 2024, a 3-Count Indictment was returned against Defendant for being a felon in possession of firearms under 18 U.S.C. § 922(g)(1). (Doc. 1). Defendant was charged with possessing a Smith and Wesson 9mm pistol, a Glock 43X pistol, and a Ruger SR9C pistol. (Doc. 1). He has prior felony convictions for the unlawful possession, with intent to deliver, a controlled substance, and the unlawful possession of a weapon by a felon. (Sealed Doc. 41, pgs. 9, 11). After the Government filed a Motion for Detention, alleging he is a danger to the community, Defendant was temporarily detained. (Docs. 9 & 16). A detention hearing was held on February 28, 2024, after which Defendant was detained pending trial. (Docs. 22 & 23). Magistrate Judge Beatty, in part, explained:

1

> When the Court considers the history and characteristics of the Defendant, the Court is mindful of the letters in support of the Defendant as well the fact that he has a home plan and potential employment. The Court also notes that the Defendant has a concerning criminal history that includes multiple weapons charges and felony convictions. Of note, the Defendant was charged with Aggravated Unlawful Use of a Weapon in 2013 and ultimately plead guilty to an amended charge of Firearm without Valid FOID. On that charge the Defendant had multiple Failure to Appears ("FTA's") and was discharged from probation unsuccessfully. The Defendant was charged with multiple offenses in 2015 and ultimately plead guilty to one felony that included a firearm. Again here, the Defendant was unsuccessful while under Court supervision. He had one FTA, and was terminated unsuccessfully from probation. In 2020, again, the Defendant was convicted of a felony related to firearms. He was sentenced to five years incarceration. There are also numerous convictions for misdemeanor offenses such as theft, drug possession, and obstructing identification. In whole, when the Court considers all of the facts here—even the positives for Defendant such as his home plan and letters of support—this factor still weighs in favor of detention given the nature and number of convictions in his criminal history…. And finally, the nature and seriousness of the danger to any person or the community that would be posed by the Defendant's release, likewise counsels in favor of detention.

(Doc. 23, pg. 3).

On July 31, 2024, Defendant pled guilty to the Indictment pursuant to a plea agreement with the Government. (Docs. 32 & 33). Defendant was scheduled to be sentenced, after multiple continuances, on February 27, 2025. (Docs. 32, 39, 46, 49). However, in the interim, Defendant signaled a desire to seek a dismissal of the Indictment. (Doc. 48). Therefore, Defendant's Sentencing was again continued to March 26, 2025. (Doc. 50). The instant Motions were filed on March 6, 2025. (Docs. 51 & 52).

## II. ANALYSIS

Under Federal Rule of Criminal Procedure 11(d)(2)(B), "[a] defendant may withdraw a plea of guilty…after the court accepts the plea, but before it imposes sentence

if…the defendant can show a fair and just reason for requesting the withdrawal." Fed. R. Crim. P. 11(d)(2)(B). The presentation of a "fair and just reason," which is "no mean feat," can include a showing of legal innocence, actual innocence, or that it was entered unknowingly or involuntarily. *U.S. v. Barr*, 960 F.3d 906, 917 (7th Cir. 2020) (citing *U.S. v. Mays*, 593 F.3d 603, 607 (7th Cir. 2010)); *U.S. v. Rinaldi*, 461 F.3d 922, 926-27 (7th Cir. 2006).

Importantly, though, a defendant does not have an absolute right to withdraw a guilty plea, and that relief should not be "lightly" granted. *Barr*, 960 F.3d at 917 (citing *U.S. v. Lundy*, 484 F.3d 480, 484 (7th Cir. 2007)); *U.S. v. Smith*, 989 F.3d 575, 581 (7th Cir. 2021) (quoting *U.S. v. Brown*, 973 F.3d 667, 715 (7th Cir. 2020)); *accord Rinaldi*, 461 F.3d at 926 (citing *U.S. v. Bradley,* 381 F.3d 641, 645 (7th Cir. 2004)). This is because guilty pleas, which represent "a formal and solemn step[] where the defendant admits his guilt under oath after assuring the court…that he is ready, willing, and able to make that decision after consulting sufficiently with his lawyer and being informed about all matters that he needs to know about," are not to be used "as a strategic maneuver by the parties." *U.S. v. Graf*, 827 F.3d 581, 584 (7th Cir. 2016) (citing Fed. R. Crim. P. 11(b)); *Rinaldi*, 461 F.3d at 926-27 (citing *U.S. v. Silva,* 122 F.3d 412, 415–16 (7th Cir. 1997)); *see also* Fed. R. Crim. P. 11(b) (requiring, before the acceptance of a guilty plea, that the Court address the defendant in open court to inform and ensure understanding of, *inter alia*, the voluntariness of the guilty plea, the factual basis for the guilty plea, the waiver of the defendant's trial rights, the nature of the charges against the defendant, and the terms of any plea agreement that waive the right to appeal or to collaterally attack the sentence).

It is within the Court's discretion to decide whether to allow the withdrawal of a guilty plea and, when so deciding, it "presumes the verity of the defendant's statements made at a Rule 11 colloquy." *See Barr*, 960 F.3d at 917 (citing *U.S. v. Jansen*, 884 F.3d 649, 656 (7th Cir. 2018)); *Rinaldi*, 461 F.3d at 926-27 (citing *U.S. v. Messino,* 55 F.3d 1241, 1248 (7th Cir. 1995)). The Court has the following three options when considering such a request of a defendant: (1) it can grant the withdrawal of the guilty plea; (2) it can conduct a hearing; or (3) it can deny the withdrawal of the guilty plea after explaining why the evidence is insufficient or incredible. *Rinaldi*, 461 F.3d at 927.

Here, the entirety of Defendant's argument for a plea withdrawal is as follows:

> Defendant contends that two of the three factors presented in *Graf* apply to his case. Defendant first claims that he is legally innocent of the offenses brought against him due to the unconstitutional nature of 18 U.S.C. § 922(g)(1). The reasons for the first factor are more fully explained in Defendant's Motion to Dismiss, which has been filed concurrent with this motion.
>
> Defendant also contends that his guilty plea was not knowingly and voluntary. Defendant states that he believed his offense level to be 19 and his sentencing guideline was 57-71 months pursuant to the plea agreement signed on July 23, 2024. After his plea, a presentence investigation report was completed and his offense level was raised to 27 and making his new sentencing guideline 110-137 months.
>
> Defendant's main reason for pleading guilty to the instant offense is due to the low guideline range of 57-71 months that was previously represented to him in the plea agreement. It was only after his plea of guilty that his sentencing guideline increased significantly, and he believes that his sentencing guideline was misrepresented to him to get him to plead guilty.

(Doc. 51, pg. 2).

Upon review of these arguments, together with those contained in the Response

of the Government, the Court finds no "fair and just reason" for Defendant to withdraw his guilty plea. *See* Fed. R. Crim. P. 11(d)(2)(B); *Barr*, 960 F.3d at 917; *Rinaldi*, 461 F.3d at 926-27; *Mays*, 593 F.3d at 607. When assuming the verity of his statements during the Rule 11 colloquy with the Court at the July 31, 2024, Change of Plea Hearing, it is clear Defendant, while under oath, knowingly and voluntarily entered a guilty plea after affirming he understood: (1) he could stop the proceedings at any time to obtain legal counsel; (2) the charges in the Indictment, as read by him and reviewed with the Court; (3) the elements that must be proven, beyond a reasonable doubt, by the Government to convict him under § 922(g)(1); (4) the possible penalties under the Indictment; (5) the Stipulation of Facts, which he read, reviewed with his attorney, and voluntarily signed; (6) the independent factual basis of the Government to be true and accurate; (7) the Plea Agreement, which he read, reviewed with his attorney, and voluntarily signed; (8) he had, but was giving up, the rights to a jury trial, to trial counsel, to cross-examine and confront witnesses, to subpoena witnesses and present other evidence, and to testify on his own behalf if he so chose; (9) he was prevented from filing any motions or otherwise attacking the Indictment by pleading guilty; (10) he has fewer bases on which to file an appeal after pleading guilty; (11) he is bound by the terms of the Plea Agreement once it is accepted by the Court; (12) the Court is not bound by the terms of the Plea Agreement, including the calculation of the guideline sentencing range of 57 to 71 months, so "the sentence that [he] receive[s] may or may not be within that range"; (13) "judges…have wide discretion…to depart or vary from those guidelines, in which case [he] could end

up with a more severe sentence or less severe sentence, depending on a number of factors"; (14) there are occasions when an offense, countable toward the criminal history component of the sentencing guideline, is overlooked and negatively affects the sentencing guideline; and (15) he is "probably the best person in the room to know whether there are any missing convictions." *See Graf*, 827 F.3d at 584 ("A defendant's motion to withdraw is unlikely to have merit if it seeks to dispute his sworn assurances to the court."); *Mays*, 593 F.3d at 607 ("When a proper Rule 11 colloquy has taken place, a guilty plea enjoys a presumption of verity and the 'fair and just' Rule 11(d)(2)(B) escape hatch is narrow…. A defendant's burden of showing the existence of a fair and just reason is heavy in such circumstances."); (Doc. 53, pgs. 2, 6-10, 12-27).[1]

Also, at the Change of Plea Hearing, Defendant indicated that he received adequate legal representation and was happy with his attorney. (Doc. 53, pg. 25). He does not claim otherwise now. As a result of the thorough Rule 11 colloquy and Defendant's ultimate decision to knowingly and voluntarily plead guilty, it is equally clear to the

---

[1] In the Plea Agreement itself, Defendant waived, among other rights, "the right to file pretrial motions" and "the right to seek modification of, or contest any aspect of, the conviction or sentence in any type of proceeding, including the manner in which the sentence was determined or imposed." (Doc. 33, pgs. 8-9) (Emphasis in original omitted.). In this same vein, the Plea Agreement also provides:

> Pursuant to Federal Rule of Criminal Procedure 11(c)(1)(B), the Court is not bound by the parties' calculations of the US Sentencing Guidelines range set forth in this Plea Agreement or by the parties' sentencing recommendations. Therefore, the Court may impose a different sentence than what is described in this Plea Agreement—anywhere between the minimum sentence (if any) up to the statutory maximum sentence. If the Court imposes a different sentence than what is described in this Plea Agreement, the parties shall not be permitted to withdraw from the Plea Agreement and the Defendant will not be permitted to withdraw the guilty plea.

(Doc. 33, pg. 8).

Court that he waived both his claim of legal innocence and the claim that the sentencing guideline was misrepresented. *See U.S. v. Onamuti*, 983 F.3d 892, 895 (7th Cir. 2020) (holding there was no basis on which to find the defendant's "broad appellate waiver," which foreclosed the request to withdraw his guilty plea and the challenge to the district court's refusal to hold an evidentiary hearing on that request, was not knowing and voluntary, where the defendant "repeatedly acknowledged, both in the plea agreement and while under oath before the district court, that he understood the rights he was waiving and the…consequences of his plea, all of which he confirmed having discussed with his attorney"); *U.S. v. Seavoy*, 995 F.2d 1414, 1421 (7th Cir. 1993) (concluding the defendant failed to show a "fair and just reason" for withdrawing his guilty plea, such that his voluntary responses under oath at the change of plea hearing were binding, where the district court's "firsthand observation of the defendant" revealed he was not pressured or coerced and he acknowledged a waiver of rights under Rule 11); *U.S. v. Rogers*, 387 F.3d 925, 933-34 (7th Cir. 2004) (affirming the denial of a motion to withdraw guilty plea where, *inter alia*, the guilty plea's unconditional nature waived the right to appeal a non-jurisdictional constitutional violation not considered by the district court).

Nevertheless, the Court briefly addresses Defendant's mistaken belief that the alleged unconstitutional nature of § 922(g)(1), in light of *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1 (2022), demonstrates his legal innocence for purposes of withdrawing the knowing and voluntary guilty plea. *Bruen* articulated a new historical test for determining the scope of the Second Amendment right to possess firearms. The

Supreme Court articulated the following test in that case:

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

*Id*. at 24 (citing *Konigsberg v. State Bar of California*, 366 U.S. 36, 50 n. 10 (1961)); *see also U.S. v. Rahimi*, 602 U.S. 680, 692 (2024) ("As we explained in *Bruen*, the appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition."). Therefore, after *Bruen*, the Court must ask two questions when considering a Second Amendment challenge: (1) whether the plain text of the Second Amendment covers the conduct at issue; and (2) if the conduct is covered, whether the Government can establish that the regulation is consistent with the historical tradition of firearms regulation in the United States. *See Bruen*, 597 U.S. at 24.

Following *Bruen*, there have been "a flurry of filings across the country challenging various firearms regulations," including, as is relevant here, § 922(g)(1). *U.S. v. Johnson*, No. 18-cr-458, 2023 WL 6690388, *2 (N.D. Ill. Oct. 12, 2023). The overwhelming majority of decisions considering the issue, including decisions by the undersigned, have concluded that § 922(g)(1) remains constitutional after *Bruen*. *See U.S. v. Calhoun*, 710 F. Supp. 3d 575, 583 n. 8 (N.D. Ill. 2024) (collecting cases). When analyzing challenges to § 922(g)(1), the undersigned has found that the plain text of the Second Amendment covers the conduct at issue, that is, the possession of firearms by a convicted felon.

The Government disagrees, arguing that Second Amendment protections only

8

extend to law-abiding citizens. In making this argument, the Government notes that *Bruen*, and related Second Amendment authority, often associate the Second Amendment's protections with "law-abiding" citizens. Additionally, the Government relies heavily on Supreme Court *dicta* emphasizing that the Court's recent Second Amendment opinions should not be interpreted to cast doubt on the longstanding prohibition on the possession of firearms by felons. *See, e.g., D.C. v. Heller*, 554 U.S. 570, 626-27 (2008) ("[N]othing in our opinion should be taken to cast doubt on the longstanding prohibitions on the possession of firearms by felons and the mentally ill."); *Bruen*, 597 U.S. at 81 (same) (Kavanaugh, J. concurring); *McDonald v. City of Chicago*, Ill., 561 U.S. 742, 786 (2010) ("We made it clear in *Heller* that our holding did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons and the mentally ill.' "); *Rahimi*, 602 U.S. at 692 ("In fact, our opinion stated that many such prohibitions, like those on the possession of firearms by felons and the mentally ill, are presumptively lawful."). The Government suggests this language, which has come to be known as the "*Heller* Safe Harbor," *see, e.g.*, Brannon P. Denning & Glenn H. Reynolds, *Heller, High Water(Mark)? Lower Courts and the New Right to Keep and Bear Arms*, 60 Hastings L.J. 1245, 1247 (2009), reflects that felons are not part of the "people" contemplated in the Second Amendment. The Government also suggests the "*Heller* Safe Harbor" is "considered dicta" that "this Court is not free to ignore." (Doc. 25, pg. 4).

There is no dispute that the Supreme Court's recent decisions often associate Second Amendment protections with "law-abiding citizens," or that these decisions

contain *dicta* emphasizing the prohibition on the possession of firearms by felons is presumably lawful. The Court also acknowledges that the Seventh Circuit has stated, absent controlling precedent, considered Supreme Court dictum "provides the best, though not an infallible, guide to what the law is, and it will ordinarily be the duty of a lower court to be guided by it." *Reich v. Cont'l Cas. Co.*, 33 F.3d 754 (7th Cir. 1994).[2] The Government, however, is overreading the import of the language on which it relies.

The facts of the referenced cases did not give the Supreme Court the opportunity to consider whether convicted felons were part of "the people," as contemplated in the Second Amendment. The Court also notes, in *Heller*, the Supreme Court indicated the term "people," as used in the Constitution, "unambiguously refers to all members of the political community, not an unspecified subset," and began its analysis with a "strong presumption" that the Second Amendment right "belongs to all Americans." *Heller*, 554 U.S. at 580-81. The Seventh Circuit has also expressly rejected the notion that the "*Heller* Safe Harbor" stands for the proposition that non-law-abiding citizens are excluded from the scope of the Second Amendment, stating as follows:

> We do not think it profitable to parse these passages of *Heller* as if they contained an answer to the question whether § 922(g)(9) is valid. They are precautionary language. Instead of resolving questions such as the one we must confront, the Justices have told us that the matters have been left open. The language we have quoted warns readers not to treat Heller as containing broader holdings than the Court set out to establish: that the Second Amendment creates individual rights, one of which is keeping operable handguns at home for self-defense. What other entitlements the

---

[2]*But see Andrew v. White*, 604 U.S. ----, 145 S. Ct. 75, 83 (2025) (Thomas & Gorsuch, JJ., dissenting) ("We have instructed lower courts to avoid framing our precedents at too high a level of generality; to carefully distinguish holdings from dicta; and to refrain from treating reserved questions as though they have already been answered.").

10

> Second Amendment creates, and what regulations legislatures may establish, were left open. The opinion is not a comprehensive code; it is just an explanation for the Court's disposition. Judicial opinions must not be confused with statutes, and general expressions must be read in light of the subject under consideration.

*U.S. v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010); *see also Kanter v. Barr*, 919 F.3d 437, 445 (7th Cir. 2019) ("[T]he [Supreme] Court never actually addressed the historical pedigree of felon dispossession laws. Accordingly, we have refused to read too much into the Court's 'precautionary language.' "); *Atkinson v. Garland*, 70 F.4th 1018, 1022 (7th Cir. 2023) (declining an invitation to forego the *Bruen* analysis "based on oft-quoted *dicta* describing felon-in-possession laws as 'presumptively lawful' "). For these reasons, the Court rejects the Government's contention, regarding the *dicta* from *Heller* and its progeny, and instead proceeds to a discussion of the historical analysis contemplated by *Bruen*.

Specifically, the Court finds Defendant is a person within the term "people," as used in the Second Amendment. The phrase "the people" is used in notable places in the Constitution, and it "refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community." *Heller*, 554 U.S. at 580 (quoting *U.S. v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990)). As was emphasized in *Heller*, in all six other provisions of the Constitution mentioning "the people," the term unambiguously refers to all members of the political community, not an unspecified subset. *Id*. Accordingly, there is a "strong presumption that the Second Amendment right is exercised individually *and belongs to all Americans*." *Id*. at 581 (Emphasis added.); *see also U.S. v. Ball*, No. 22-cr-449, 2023 WL

8433981, *6 (N.D. Ill. Dec. 5, 2023) ("[N]either *Heller* nor *Bruen* involved the issue of felons, much less the issue of the Second Amendment's textual scope as it applies to felons. So, while the Supreme Court in both cases referred to law-abiding citizens in discussing the Second Amendment's scope, it did not *hold* in either case that 'the people' was limited to law-abiding people.") (Emphasis in original.). The record reflects that Defendant is an American citizen and, therefore, that he is afforded the rights available under the Second Amendment, despite being a felon. *See Ball*, 2023 WL 8433981 at *7 (concluding that felons are not categorically excluded from the plain textual scope of the Second Amendment).

Next, there is no dispute that "arms," as used in the Second Amendment, includes the firearms allegedly found in Defendant's possession. The 18th Century meaning of "arms" is no different than the meaning today. *See Heller*, 554 U.S. at 581. An "important" legal dictionary from 1771 defined "arms" as "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another." *Id*. (quoting 1 A New and Complete Law Dictionary; citing N. Webster, American Dictionary of the English Language (1828) (reprinted 1989)). Handheld firearms date back to as early as the 17th Century and were common during the years of ratification. Clearly, the pistols at issue fit within the term "arms," as used in the Second Amendment. *See id*. at 582 ("Just as the First Amendment protects modern forms of communications…and the Fourth Amendment applies to modern forms of search…the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding."). It follows, then, that the Second Amendment

presumptively protects the possession of a pistol, and that finding accords with *Heller*.

However, § 922(g)(1) excludes from that protected activity those who have been convicted of a crime punishable by more than one year of imprisonment. *See* 18 U.S.C. § 922(g)(1). The potential problem for § 922(g)(1) lies in the fact that its regulation of the Second Amendment right began nearly 200 years after ratification. *See Bruen*, 597 U.S. at 19 (" '[P]ost-ratification adoption or acceptance of laws that are inconsistent with the original meaning of the constitutional text obviously cannot overcome or alter that text.' ") (quoting *Heller v. D.C.*, 670 F.3d 1244, 1274 n. 6 (D.C. Cir. 2011) (Kavanaugh, J., dissenting)). Accordingly, the Government is required to "demonstrate[e] that it is consistent with the Nation's historical tradition of firearm regulation," and "[o]nly then may [the] court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.' " *Id*. at 24. (citing *Konigsberg*, 366 U.S. at 50 n. 10).

Importantly, "[t]here seems…no doubt, on the basis of both text and history, that the Second Amendment conferred an individual right to keep and bear arms. Of course the right was not unlimited." *Heller*, 554 U.S. at 595. As alluded to above, whether a regulation interferes with that individual right "requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding." *Bruen*, 597 U.S. at 26. On this point, *Bruen* teaches as follows:

> When confronting such present-day firearm regulations, this historical inquiry that courts must conduct will often involve reasoning by analogy…. Like all analogical reasoning, determining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are "relevantly similar."

*Id*. at 28-29 (citing C. Sunstein, On Analogical Reasoning, 106 Harv. L. Rev. 741, 773 (1993)).

Recently, in *Rahimi*, the Supreme Court considered the constitutionality of § 922(g)(8)(C)(i), which disarms persons against whom a court has issued a restraining order and who was found to pose "a credible threat to the physical safety" of a protected person. Applying *Bruen's* historical analysis, the Court upheld the constitutionality of § 922(g)(8)(C)(i) and, in doing so, clarified the Second Amendment test as follows:

> [S]ome courts have misunderstood the methodology of our recent Second Amendment cases. These precedents were not meant to suggest a law trapped in amber…. [T]he Second Amendment permits more than just those regulations identical to ones that could be found in 1791. Holding otherwise would be as mistaken as applying the protections of the right only to muskets and sabers…. [T]he appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition. A court must ascertain whether the new law is relevantly similar to laws that our tradition is understood to permit, applying faithfully the balance struck by the founding generation to modern circumstances…. Why and how the regulation burdens the right are central to this inquiry. For example, if laws at the founding regulated firearm use to address particular problems, that will be a strong indicator that contemporary laws imposing similar restrictions for similar reasons fall within a permissible category of regulations. Even when a law regulates arms-bearing for a permissible reason, though, it may not be compatible with the right if it does so to an extent beyond what was done at the founding. And when a challenged regulation does not precisely match its historical precursors, it still may be analogous enough to pass constitutional muster. The law must comport with the principles underlying the Second Amendment, but it need not be a "dead ringer" or a "historical twin."

*Rahimi*, 602 U.S. at 691-92 (quotations and citations omitted).

Under this legal framework, historical sources must be sifted through and examined to find reliable indicia of our forefathers' most probable intellectual reactions to the modern regulation or law in question. This process necessarily entails a quarry of

14

analogous, but not entirely identical, legislative artifacts that help to determine the scope of the right, as understood by those who adopted the Amendment. The undersigned recently issued opinions with such a historical analysis of similar § 922(g)(1) challenges. *See, e.g., U.S. v. Sloat*, 705 F. Supp. 3d 862 (S.D. Ill. 2023); *U.S. v. Perkins*, 709 F. Supp. 3d 610 (S.D. Ill. 2023); *U.S. v. Clubb*, No. 23-cr-30099, 2024 WL 167676 (S.D. Ill. Jan. 16, 2024); *U.S. v. Wiley*, 718 F. Supp. 3d 888 (S.D. Ill. 2024), appeal dismissed, No. 24-1421, 2024 WL 4212901 (7th Cir. Apr. 11, 2024); *U.S. v. Pierce*, No. 23-cr-30046, 2024 WL 1554835 (S.D. Ill. Apr. 10, 2024); *U.S. v. Cole*, No. 24-cr-30018, 2025 WL 305459 (S.D. Ill. Jan. 27, 2025). In each opinion, this Court held that the history of the right to keep and bear arms—before, during, and after the Founding Era— provides a sufficient historical tradition to support enforcement of § 922(g)(1). *See, e.g., Perkins*, 709 F. Supp. 3d at 618 ("There are ample 'distinctly similar' historical exemplars and models demonstrating individually, and certainly collectively, that regulations disarming disloyal, dangerous, or merely untrustworthy individuals were not uncommon in the early history of our Country.").

Defendant contends § 922(g)(1) is unconstitutional, as applied, because his criminal history involves only nonviolent felonies. The Government, in part, responds that Defendant's argument should be denied, as perfunctory, because it fails to apply the analytical framework set forth in *Atkinson v. Garland*, 70 F.4th 1018 (7th Cir. 2023). In that case, a civil litigant with a 24-year-old conviction for mail fraud brought an as-applied constitutional challenge to § 922(g)(1). Because the district court dismissed his complaint before the Supreme Court articulated its historical analysis test in *Bruen*, the Seventh

15

Circuit remanded "to allow the district court to undertake the *Bruen* analysis in the first instance." *Id*. at 1022. In doing so, the Seventh Circuit identified a series of questions intended to "help focus the proper analysis on remand." *Id*. at 1023.

The Court agrees Defendant's showing under *Atkinson* is insufficient. For example, like the defendant in *Atkinson*, Defendant does not provide the Court with a "historical basis for individualized assessments" or carveouts between "individuals who committed violent versus nonviolent crimes" for purposes of § 922(g)(1). Without such an analysis, and considering the historical evidence reviewed by the Court, the Court concludes there is no basis for an individualized assessment based on dangerousness. In fact, as outlined in the Government's briefing and as discussed in this Court's prior opinions, history is replete with representative analogues establishing a historic principle of disarming individuals for non-violent offenses. *See, e.g., Pierce*, 2024 WL 1554835 at *7 (identifying numerous historical exemplars demonstrating a history of disarming individuals perceived or deemed to be disloyal, untrustworthy, or criminal, as well as a history of disarming individuals who committed non-violent offenses); *see also U.S. v. Young*, No. 22-cr-20, 2023 WL 8697936, at *2–3 (N.D. Ind. Dec. 15, 2023) ("[T]he historical record shows strong support for the ability to categorically prohibit a defined group from possessing arms based on the legislature's assessment the group was dangerous or untrustworthy, without individual dangerousness assessments of group members.").

Even if historical tradition supported disarming only "dangerous" or "violent" individuals, Defendant's criminal history, including his prior felonies related to drugs

and guns, supports a finding of dangerousness. As the Government notes, that criminal history shows "the risk Defendant poses to public safety, his disregard for the law, and society's inability to trust that he will use a weapon responsibly." (Doc. 55, pg. 54).

Incorporating the Court's prior reasoning to reject similar § 922(g)(1) challenges, and applying the legal framework set forth in recent Second Amendment decisions from the Supreme Court and the Seventh Circuit, the Court finds § 922(g)(1) is part of the Nation's historical tradition that delimits the outer bounds of the right to keep and bear arms under the Second Amendment. Therefore, the Court concludes Defendant has not made the requisite showing of legal innocence, as necessary to withdraw his guilty plea.

### III. CONCLUSION

For the reasons explained above, the Motion to Withdraw Guilty Plea is **DENIED** and the Motion to Dismiss Indictment is **DENIED as moot**. Defendant's Sentencing Hearing remains scheduled for March 26, 2025. (Doc. 50).

**SO ORDERED.**

Dated: March 24, 2025

*s/ David W. Dugan*
———————————
DAVID W. DUGAN
United States District Judge